IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 1, 2018

**IN RE KIARA S. ET AL**

**Appeal from the Juvenile Court for Cocke County**
**No. TPR-05771      Brad Lewis Davidson, Judge**

_____

**No. E2018-01131-COA-R3-PT**

_____

The trial court entered an order terminating Father's parental rights to his two minor children based upon the statutory grounds of abandonment by willful failure to visit, abandonment by willful failure to support, and persistence of conditions, as well as a finding that termination was in both children's best interest. From this order, Father appeals. We affirm the trial court's findings as to the grounds of willful failure to visit and willful failure to support, but reverse the finding that clear and convincing evidence supports termination based upon the statutory ground of persistence of conditions. Because we conclude that termination is in the children's best interest, we affirm the termination of Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part; and Reversed in Part**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Brett A. Cole, Seymour, Tennessee, for the appellant, Carmen S.

Herbert H. Slatery, III, Attorney General and Reporter;  Erin A. Shackelford, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**Background**

This is a termination of parental rights case. The children at issue, Kiara S. and Kyle S., are the children of unmarried parents Carmen S. ("Father") and Scarlett B.

("Mother").[1] Kiara was born in May of 2015, and Kyle was born in January of 2017. The Tennessee Department of Children's Services ("DCS") became involved with the children shortly after Kyle's birth, as DCS received a referral that Kyle was born with neonatal abstinence syndrome ("NAS"), meaning that Kyle was exposed to drugs in utero. Thus, shortly after Kyle's birth, DCS visited Father's home to check on the children.[2] This visit prompted concerns about the living conditions within the home, which DCS reported were "deplorable." Moreover, DCS was concerned about Mother's presence in the home, as Kiara had already been removed from Mother's custody and placed with Father in 2015; Mother was not allowed to be present in the home or exercising unsupervised time with Kiara. DCS met with Father on January 11, 2017 to discuss the changes necessary for the home to be made appropriately safe and clean for the children.

On January 24, 2017, DCS returned to Father's home and found it unimproved. The caseworker who made the visit reported that the home had a strong odor of marijuana, was extremely dirty, and that there was exposed wiring and insulation in the baby's room. Mother was also still present in the home. DCS administered drug tests to all of the adults living in the home, including Father and his parents, and all tests were positive for marijuana. Mother also tested positive for oxycodone. As such, DCS filed a petition for emergency custody of the children that was granted on January 25, 2017. The children were placed with their foster parents at that time, and have remained in that placement since.[3]

The trial court adjudicated the children dependent and neglected on March 2, 2017. In its order, the trial court found that Kyle was the victim of severe abuse due his NAS diagnosis. *See* Tenn. Code Ann. § 37-1-102(b)(21) ("'Severe child abuse' means [t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death."). Although it declined to find that Kiara was the victim of severe abuse, the trial court did note that Kiara's teeth were rotted and turning black, and also cited the poor living conditions in Father's home as reported by DCS. The trial court's order also noted that Mother's presence in Father's home was in direct contravention of a 2015 court order.[4]

A permanency plan was developed on February 2, 2017. The plan required that Father (1) attend parenting classes and provide proof of completion to DCS; (2) obtain

---

[1] In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] As discussed in detail *infra*, only Father filed a brief in this case. As such, we recite the facts only as they pertain to Father.

[3] Kiara and Kyle's older half-siblings also reside with these foster parents.

[4] The details of the 2015 order prohibiting Mother from living in the home with Kiara are unclear. All that we can discern from the record is that at some point in 2015, Kiara was removed from Mother's custody and placed with Father, and Mother was ordered to leave Father's home.

and maintain a legal source of income and provide proof to DCS; (3) maintain contact with DCS at least twice a month; (4) resolve safety risks in the home, and allow DCS to do random walk-throughs; (5) attend anger management, follow all recommendations, and provide proof of completion to DCS; (6) attend a mental health assessment, follow all recommendations, and provide proof to DCS; (7) attend an alcohol and drug assessment and follow all recommendations, and provide proof to DCS; and (8) submit to random drug screens. The original goal of the permanency plan was return to parent, and the plan was ratified by the trial court July 13, 2017. The parents were allocated two supervised visits per month, and the ratification order indicated that the parents would be allowed unsupervised visitation upon providing proof of completion of training for Kyle's specialized breathing treatment.[5]

It is undisputed that after the entry of the first permanency plan,[6] Father visited the children several times and would talk on the phone with them regularly. However, the family's DCS caseworker, Katie Ferguson, filed an affidavit of continuing reasonable efforts on August 23, 2017, opining that she was experiencing great difficulty in working with Father. According to Ms. Ferguson, it was difficult to discern what progress Father was making on his plan because Father was argumentative and hostile towards Ms. Ferguson, and because Ms. Ferguson felt that Father was being dishonest about completing the steps in the plan as well as regarding his search for employment. Ms. Ferguson noted that Father was discharged from his anger management program for noncompliance and that while Father indeed completed parenting classes, he was not following the recommendations therefrom. Ms. Ferguson also expressed great concern that Father had not yet completed any training on how to administer Kyle's breathing treatments. Notably, Ms. Ferguson stated that she had been unable to complete any visits to Father's home because Father informed her that she was not welcome in the home until the children were returned to his custody.

Ms. Ferguson filed another affidavit on October 18, 2017, opining as to largely the same issues as listed in her first affidavit. Although Ms. Ferguson explained that she was able to complete a home visit on October 13, 2017, she still had serious concerns about the condition of the home. Namely, there was still exposed wiring in the children's room, and the children's room was apparently insulated with comforters and blankets that were stuffed into the ceiling. There was no bed for Kyle, but only a pack and play that Ms. Ferguson alleged was very dirty. Ms. Ferguson averred that the home as a whole was extremely dirty and that this concerned her because of Kyle's sensitive respiratory issues. Also concerning to Ms. Ferguson was the presence of a free-standing wood stove in the kitchen, as she felt this created a safety hazard for the children as well as air quality

---

[5] Because of his NAS, Kyle suffers from severe issues with his upper respiratory system and requires ongoing care for this condition.

[6] Although a second permanency plan was created in August of 2017, it appears that the requirements for Father were largely the same, and this second plan was never ratified by the trial court.

issues that would be problematic for Kyle. Additionally, Ms. Ferguson noted that Father had only visited the children twice since June, and that while there were several visits scheduled in September and October, Father had either cancelled or not come to the visits.

As a result of these continuing issues, DCS filed a petition to terminate both Mother's and Father's parental rights on November 9, 2017. The statutory grounds alleged by DCS were abandonment by willful failure to visit, abandonment by willful failure to provide support, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plan, persistence of conditions, and severe abuse with regard to Mother only. The trial court held its hearing on the petition on April 19, 2018. During the trial of this matter, the court heard testimony from Ms. Ferguson as well as Kiara's therapist, Helen Lyle-Joiner, Amanda H. ("Foster Mother"), as well as both Mother and Father.

Ms. Ferguson's testimony in large part mirrored her affidavits of continuing reasonable efforts. Ms. Ferguson testified that although Father had completed certain aspects of his permanency plan, such as parenting classes and an alcohol and drug assessment, there was no proof of completion provided to DCS and no proof that Father was complying with the follow-up recommendations. Ms. Ferguson testified that in general, Father was very uncooperative and that he easily lost his temper with Ms. Ferguson or the children. In particular, Ms. Ferguson noted that during Father's phone calls with Kiara, he would often become upset with the child if he heard Kiara refer to her foster parents as "mom" and "dad." In one instance, Ms. Ferguson heard Father tell Kiara that she had to call the foster parents "Ms. Amanda" and "Mr. Bryan" because they had not earned the right to be called "mom" and "dad."

Overall, it was Ms. Ferguson's position that Father's erratic behavior prevented a loving relationship with Kiara, as Kiara would often ask not to participate in phone calls or would become extremely upset afterwards. Kiara has, according to Ms. Ferguson, indicated that she wishes to remain in the care of her foster parents rather than being returned to her biological parents.

Ms. Ferguson also testified that Father and Kyle essentially have no relationship because Kyle was placed with his foster parents at such a young age. Ms. Ferguson did testify about Kyle's health issues and how he has improved markedly since his birth. However, Ms. Ferguson also testified that when Kyle needed surgery due to having constant ear infections, she experienced resistance from Father in getting the consent form signed. Other than his health complications, Ms. Ferguson testified that Kyle was generally thriving in his foster care placement and that he appeared to be happy and stable. In Ms. Ferguson's opinion, both children were doing extremely well in the care of the child's foster family, Foster Mother and Bryan F. ("Foster Father," and together with Foster Mother, "Foster Parents"), and that it was in the children's best interest to remain

in that placement.

The court next heard testimony from Kiara's therapist, Ms. Lyle-Joiner, who was assigned to Kiara immediately upon Kiara's placement in DCS custody. Ms. Lyle-Joiner testified at length regarding the strides that Kiara has made since the beginning of her therapy. Upon first arriving in DCS custody, Ms. Lyle-Joiner found Kiara to be very erratic and essentially non-verbal. Ms. Lyle-Joiner was also adamant that Kiara had experienced some level of trauma in Father's home, likely as a result of witnessing domestic violence. This opinion was based on Ms. Lyle-Joiner's experience in doing "play therapy" with Kiara, which Ms. Lyle-Joiner described as a type of "psychotherapy that utilizes involved play to help the child express feelings." Ms. Lyle-Joiner testified that Kiara often used Barbie dolls to reenact violent scenes between the male and female dolls. Kiara would call the dolls by the names "Bozzy" and "Scarlett," which are the names by which Kiara refers to her biological parents.

While this behavior initially caused Ms. Lyle-Joiner great concern, she went on to testify that Kiara has since become more verbal and is almost like a "new child." Kiara's play with dolls no longer features aggressive scenes, and Ms. Lyle-Joiner indicated that Kiara often expresses love and affection regarding her foster parents as well as her brothers and sisters. According to Ms. Lyle-Joiner, Kiara refers to her foster parents as "mommy" and "daddy," and has expressed that she wishes to remain in the foster parents' home. When asked about Kiara's relationship with her biological parents, Ms. Lyle-Joiner testified to the following:

> [Kiara] tells me that she does not want to talk to them. She tells me that she does not want to see them. She says that basically the only thing that she likes about the visits is that they will bring her things. Otherwise she does not want to have contact with them. . . . I mean, she has talked about Bozzy yelling and telling her that they are her parents, not [Foster Parents]. That they are the mommy and daddy. She has been upset because she has told me that Bozzy calls them fools, calls [Foster Parents] fools. Tells her that they do not love her and that she will not be living with them. He tells her that she will be coming back to live with her parents.

Accordingly, Ms. Lyle-Joiner's testimony reflected her overall opinion that Kiara's emotional and mental state had improved dramatically since her placement with her foster parents and that Kiara could be exposed to violence should she be returned to Father's home.

Ms. Lyle-Joiner's testimony was echoed by the testimony of Foster Mother. While very brief, Foster Mother's testimony also indicated that both children's overall condition had improved dramatically since their placement with her and that Kyle and Kiara benefit from having developed a close relationship with their older half-siblings. According to

Foster Mother, Kiara is quite attached to her older sister and all of the children play very well together.

Foster Mother also testified about the extensive medical care and therapy that both children need on a weekly basis. Upon arriving in their custody, Kiara needed oral surgery to remove fourteen teeth and requires fairly regular follow-up visits to the dentist. Foster Mother also testified that Kyle typically has three to four appointments per week and that Kyle requires specialized care from a pulmonologist, urologist, and optometrist. Despite all of these ongoing issues, Foster Mother testified that she and Foster Father are prepared to adopt the children, and have in fact already begun the adoption process for the two older siblings.

Finally, the trial court heard testimony from Father, who testified that although it was true that he only visited the children twice in the relevant four month period, this was largely due to scheduling issues with DCS and Omni.[7] In Father's view, it was difficult to schedule visits because the family's Omni caseworker changed several times and at one point the Omni caseworker was on vacation. Father also testified that neither he nor Mother has a driver's license and that they have limited funds for gas, so transportation to and from visits was sometimes difficult. With regard to his failure to pay child support, Father was apologetic; he testified that although he does not have a lot of money, he could have paid some support towards the children's care each month and apologized to the court for not doing so.

In addressing his apparent lack of steady employment, Father testified that he sometimes has difficulty finding a job because of a past arrest.[8] However, Father also testified that he sometimes does construction work for his brother and other odd jobs for neighbors and friends. Father testified that he shares all of his expenses with his parents and that if he does not have money any given month then he does not contribute. Father was adamant, however, that a stable job was about to become available to him through a business called "Gemcare." Father also testified that he was currently in the process of obtaining his G.I. benefits.

Father further testified about the allegedly problematic conditions within his home, as well as his failure to take Kiara to a dentist. Regarding the home, Father was insistent that although the home is not perfect, it is also not "a cardboard box." Father disputed that there was exposed wiring in the children's room and opined that the wood stove was simply used for extra heat on cold nights. If it were required for Kyle's health, Father testified that he would get rid of the stove. Father also relied on previous

---

[7] Omni appears to be the agency that facilitates visitation between children in DCS custody and their parents.

[8] It is not clear from the record what Father's prior arrest is related to, although he did testify that it is from 2011.

statements from the children's guardian ad litem that the home was indeed acceptable for the children albeit not in perfect condition. In addressing the condition of Kiara's teeth, Father testified that the child's primary care physician had previously told Father that Kiara was too young to go to a dentist. Father also acknowledged that he would often give Kiara sodas and candy, and that this likely contributed to her dental issues.

Despite the foregoing, Father remained adamant that as the children's biological parent, Kyle and Kiara should be returned to his custody. In closing Father alleged that he had completed most of what was required of him under the permanency plan with little help from DCS:

> There was not really no CM help. I mean it was more – it felt like more against us than for us. At no point did it feel that the goal was to return the children to their parents. I mean, I did 12 courses because I failed for marijuana. I do not understand all that but I did it anyway whatever they said to do, we did. I might have been a little stubborn or pig-nosed about it but we accomplished it anyway.

At the conclusion of the testimony, the trial court delivered its oral ruling, determining that DCS satisfied its burden with regard to three of the statutory grounds alleged against Father: abandonment by willful failure to visit, abandonment by willful failure to support, and persistence of conditions. With regard to abandonment by failure to provide a suitable home, the trial court concluded that DCS had not offered clear and convincing evidence in light of the statements from the children's guardian ad litem that the home was acceptable. Likewise, the trial court concluded that DCS failed to prove by clear and convincing evidence that Father was substantially noncompliant with his permanency plan, seeing as how Father completed or attempted to complete several action steps. The trial court also found sufficient evidence of two grounds to terminate Mother's parental rights: abandonment by willful failure to visit and severe abuse. Finally, the trial court determined that termination of both parent's rights was in the children's best interest considering their overall improvement since being placed with their foster parents, and the fact that the foster parents wish to adopt both children and their siblings.[9] A written order detailing this ruling was entered May 22, 2018, and Father thereafter filed a timely notice of appeal.

---

[9] Here, we note that Mother did not file a notice of appeal, but rather filed a document acknowledging that she failed to perfect an appeal and would be submitting the case for decision on the record and the briefs of the other parties. Mother therefore declined to file a brief for this Court's review. Based on this filing, we perceive Mother's actions to mean that she has declined to participate in this appeal and does not contest the termination of her parental rights. While we do not think it necessary under these particular circumstances, we have reviewed the statutory grounds for termination alleged against Mother in an abundance of caution. Based upon this review, we conclude that clear and convincing evidence supports the trial court's decision to terminate Mother's parental rights based upon willful failure to visit and severe abuse. *See* Tenn. Code Ann. §§ 36-1-113(g)(1) & 36-1-113(g)(4). As

## Issues Presented

Father raises the following issues for review, which are restated from his brief:

1. Whether the trial court erred in concluding that clear and convincing evidence supports termination based on the abandonment grounds?
2. Whether the trial court erred in concluding that clear and convincing evidence supports termination based on persistence of conditions?
3. Whether the trial court erred in concluding that clear and convincing evidence supports the finding that termination is in the children's best interest?

## Standard of Review

The Tennessee Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618 at *7 (Tenn. Ct. App. Apr. 29. 2005) (citing Tenn. Code Ann. §

---

discussed *infra*, we also conclude that termination of both parent's parental rights is in the best interests of the children.

36-1-113(g)).  Thus, a party seeking to terminate a parent's rights must prove (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769.  As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence.  Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W. 3d at 546.  Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise.  Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W at 523−24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)).  Our supreme court further explains:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

Discussion

**Grounds for Termination**

In the present case, DCS alleged the following grounds for termination of Father's parental rights: abandonment by willful failure to support, abandonment by failure to visit, abandonment by failure to provide a suitable home for the children, persistence of conditions, and substantial noncompliance with the permanency plan. As a threshold matter, we note that the trial court concluded that DCS failed to prove by clear and convincing evidence abandonment by failure to provide a suitable home and substantial noncompliance with the permanency plan. Moreover, DCS has not raised the trial court's conclusion regarding these two findings as an issue on appeal. As we perceive the Tennessee Supreme Court's holding in *In re Carrington H.*, we need not review the trial court's findings as to grounds for termination if the trial court found in favor of the parent and DCS does not challenge that finding on appeal. *See In re Addalyne S.*, 556 S.W.3d 774, 796 n.6 (Tenn. Ct. App. 2018) (quoting *In re Sydney B.*, 537 S.W.3d 452, 456 (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. Aug. 1, 2017)) ("'The rule adopted in *Carrington* has never been construed to require this Court to also consider the grounds not sustained by the trial court and not challenged on appeal by the petitioning non-parent. As such, this Court is not required to review this ground for termination.'"). Consequently, we address only the termination grounds for which the trial concluded clear and convincing evidence supported the termination of Father's parental rights.

**Abandonment Generally**

Abandonment is a statutory ground for termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(1). For purposes of this appeal, Tennessee Code Annotated section 36-1-102 defines "abandonment," in relevant part, as

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or a guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i).[10] A central inquiry a court must make when determining whether a parent abandoned its child pursuant to section 36-1-102(1)(A) is

---

[10] In 2018, the Tennessee General Assembly saw fit to amend our termination of parental rights statutes to remove the element of willfulness from the definition of abandonment by failure to support or visit. See Tenn. Code Ann. § 36-1-102(1)(A)(i) (defining abandonment as, inter alia, "[f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any

whether the abandonment was willful. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i). This Court has explained the concept of willfulness in parental termination cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.
>
> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty[] or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child[.] The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's

---

amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child"). Rather than include willfulness as an element of the ground, Tennessee Code Annotated section 36-1-102(1) now provides that it is an affirmative defense:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1)(I), *enacted by* 2018 Tennessee Laws Pub. Ch. 875 (H.B. 1856), *eff.* July 1, 2018. We have previously held that this change will not apply retroactively. *See In re Gabriel B.*, No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at *4 (Tenn. Ct. App. July 23, 2018) (citing *In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004)) ("Because this change is substantive rather than procedural or remedial, however, the amended statute will not be applied retroactively to this case."). As such, we apply the version of the statute at issue when the case was initiated.

visitation do not provide justification for the parent's failure to support the child financially.

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863−64 (Tenn. Ct. App. 2005) (internal citations and footnotes omitted). For purposes of this case, the burden is on the petitioner to prove willfulness. *See In re: Leroy H.*, No. M2017-02273-COA-R3-PT, 2018 WL 3700917, at *8 (Tenn. Ct. App. Aug. 3, 2018) (discussing the burden to show willfulness); *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *17 (Tenn. Ct. App. Apr. 20, 2016) (holding that the petitioner failed to meet its burden to show that the parent's failure to support was willful). "'Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law.'" *In re Navada*, 498 S.W.3d at 593 (quoting *In re Adoption of Angela E.*, 182 S.W.3d at 640).

### Willful Failure to Visit

We begin with abandonment by willful failure to visit. Tennessee Code Annotated section 36-1-102 defines willful failure to visit as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tenn. Code Ann. § 36-1-102(E). "Token visitation" means that "under the circumstances of the individual case, [there is] nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(C). As previously discussed, we consider the four month period prior to the filing of the initial termination petition. *See In re Adoption of Angela*, 402 S.W.3d at 640. As such, the relevant period here is July 9, 2017 to November 8, 2017.

With regard to this ground, the trial court made the following relevant findings:

DCS filed its Petition to Terminate Parental Rights on November 9, 2017, making the relevant statutory time period between July 9, 2017 and November 9, 2017. During this time period, the Court finds that [Father] visited the children in person two times. In addition to the in-person visitation, the court does find that the parents attempted to visit through telephonic contact. However, the court finds without doubt that this telephonic visitation was a hindrance to the child's relationship with the parents. Testimony revealed that the child frequently asked to not have to speak on the phone while [Father] would yell at the child to speak with him.

- 12 -

Based on our review of the record, we conclude that clear and convincing evidence supports this ground for termination. Father does not dispute that in the relevant four month period leading up to the filing of the petition to terminate his parental rights, he only exercised his allotted visitation time with the children on two occasions, July 12, 2017 and August 28, 2017. Father was entitled to two visits per month with the children, meaning Father had the opportunity to visit the children at least eight times in the relevant four month period. Father, however, offered essentially no explanation as to why he declined to exercise the other six opportunities for visitation available to him between July 9, 2017, and November 8, 2017.

In this case, Father was allowed both in person and telephonic visitation. Specifically, Father was entitled to one phone call with the children per week, as well as two in person visits per month. The undisputed evidence shows that Father failed to exercise all of his allotted visitation. Here, Father spoke with Kiara on the phone once in July, five times in August, twice in September, and twice in October. Even when Father did speak with Kiara on the phone, however, the visitation was not appropriate, as Father would often yell at the child or become angry with her if she expressed a desire not to speak to Father, or if Kiara expressed that she did not wish to leave her foster parents' home. Father's exercise of in-person visitation was even more sparse, consisting of only two visits in the entire relevant four month period. This in-person visitation was Father's only contact with Kyle, as he was too young to have meaningful telephonic visitation. The evidence also showed that Father generally had no meaningful relationship with either child. As such, Father's visitation was of "an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(C). Given the circumstances, we must conclude that Father's contact with the children was nothing more than token.

The evidence also supports the trial court's finding that Father's failure to maintain contact was willful. Here, Father testified that the lack of in-person visits was the result of transportation issues. Even crediting this testimony, however, there is no excuse for the sparcity of telephonic visitation in the four month period. Moreover, in the months following the filing of the petition for termination, Father's visitation became quite regular. Ms. Ferguson testified that after the petition was filed in early November of 2017, Father requested additional visitation with the children later that month and also exercised his visitation in December. Ms. Ferguson also testified that starting in January of 2018, Father consistently exercised both scheduled visitations every month. It appears that although Father testified to having various issues obtaining transportation to and from his visits, he was quite capable of attending both monthly visits once motivated by the filing of the petition. *See* Tenn. Code Ann. § 36-1-102(1)(F) ("Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child[.]"); *see also* **In re Jacobe M.J.**, 434 S.W.3d 565, 571 (Tenn. Ct. App. 2013) (noting that "[f]ather's visitation after the filing of the petition cannot cure his failure to

visit in the four month period prior to the filing date."); *see also **In re P.G.***, No. M2017-02291-COA-R3-PT, 2018 WL 3954327, at \*17 (Tenn. Ct. App. Aug. 17, 2018) (discussing cases in which we have held that efforts that occurred only after the filing of a termination petition were "too little, too late"). The trial court's finding that clear and convincing evidence supports the ground of abandonment by willful failure to visit is affirmed.

## Willful Failure to Support

We next consider whether the trial court erred in finding clear and convincing evidence of abandonment by willful failure to support. In order to satisfy section 36-1-102, a party must prove that the parent has "willfully failed to support or ha[s] willfully failed to make reasonable payments toward the support of the child." Tenn. Code Ann. § 36-1-102(A)(1)(i). "Willful failure to support or to make reasonable payments toward support means 'the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child.'" ***In re Adoption of Angela E.***, 402 S.W.3d at 640 (quoting Tenn. Code Ann. § 36-1-102(1)(D)). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." ***In re Audrey S.***, 182 S.W.3d at 864 (citing ***In re M.J.B.***, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)). If a parent is financially unable to support a child, then the failure to support is not willful. ***Id.*** at 824 fn.33. Token support, however, does not prevent a court from finding willful failure to support. ***In re Adoption of Angela E.***, 402 S.W.3d at 641. Token support is defined as support "under the circumstances of the individual case, is insignificant given the parents means[.]" Tenn. Code Ann. § 36-1-102(B). Again, we note that in the present case, the relevant four-month period is July 9, 2017 through November 8, 2017.

With regard to this ground, the trial court found the following:

> [Father] knew or should have known that he had to pay child support because he was served with paperwork and a court date for a child support hearing. It was also covered in the Criteria to Terminate Parental Rights provided to him by DCS. [Father] is able-bodied and capable of working and earning enough to support himself as well as paying child support. [Father] reported that he was working at Onin Staffing until sometime in July, at which time it was discovered that he had walked off the job in June. In August or September, [Father] reported that he was working at Massey Construction. In October, it was discovered that [Father] had left employment with Massey Construction. [Father] then reported that he was taking odd jobs from Facebook and Craig's List; these posts began popping up around September 25.

On appeal, Father asserts that the evidence proffered at trial did not show that Father was financially able to pay child support. Father points out in his brief that during trial, he was questioned about his income and expenses and testified that he typically does not have much money remaining after contributing to monthly expenses. Thus, according to his brief, Father's failure to pay child support for both children cannot be considered willful "due to [Father's] financial hardship."

Father's argument, however, fails to acknowledge important testimony from Father that he could have paid more child support for the children during the relevant four month period, but simply did not. Indeed, when Father was questioned about having surplus funds that could have gone towards child support, Father responded "Yeah. I could have. I apologize for not."

Accordingly, we cannot find that under these circumstances the trial court erred in concluding that clear and convincing evidence supports the ground of willful failure to support. While the record reflects that Father may struggle financially, he admitted at trial that he could have paid child support for the children. This Court has previously held, under similar circumstances, that a parent's candid admission that he could have paid child support and simply did not do so buttressed the petitioner's contention that the parent willfully failed to support the child. *See* **In Re Addalyne S.**, 556 S.W.3d 774, 790–92 (Tenn. Ct. App. 2018) ("the record shows that [father] had the ability to make this payment throughout the four-month period, rather than for a single month. . . . Coupled with [f]ather's admission at trial that he had the knowledge and ability to pay support but did not do so, we conclude that [petitioners] provided clear and convincing evidence that [f]ather willfully failed to provide no more than token support in the relevant period.").

In the present case, Father offered no financial support to the children in the relevant four month period, but made one child support payment after the filing of the petition for termination. Although the evidence reflects that Father would sometimes bring small items for the children to visitation, such as snacks, clothes, or diapers, these items are "insignificant" in light of Father's admission that he could have paid child support. Tenn. Code Ann. § 36-1-102(B). Thus, under the circumstances of this case, what was offered by Father was, in light of his own admission, merely "token" support. Tenn. Code Ann. § 36-1-102(B). Clear and convincing evidence therefore supports the finding that Father willfully failed to support the children for the four months preceding the filing of the petition to terminate his parental rights. As such, the trial court's finding with regard to this ground is affirmed.

## Persistence of Conditions

We next consider whether DCS presented clear and convincing evidence that Father failed to remedy the conditions that necessitated removal of the children. Pursuant

to Tennessee Code Annotated section 36-1-113(g)(3), the court may terminate parental rights when a child "has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child," and

> The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian; (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(i).[11]

Failure to remedy the conditions which led to removal need not be willful. ***In re T.S. and M.S.,*** No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000) (citing ***State Dep't of Human Servs. v. Smith,*** 785 S.W.2d 336, 338 (Tenn. 1990)). "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child

---

[11] This ground for termination was also amended in 2018. *See* 2018 Tenn. Laws Pub. Ch. 875 (H.B. 1856), eff. July 1, 2018. The current version of the statute provides a ground for termination where

> (A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard.

Neither party argues that this Court should apply the current version of the statute; as such, we apply the version in effect at the time the termination petition was filed.

to the parent's care." ***In re A.R.***, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing ***In re T.S.***, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). "Where . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." ***Id.*** The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." ***Id.*** (quoting ***In re D.C.C.***, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

As previously discussed, this ground for termination is only applicable where the child has been removed from the custody of the parent for six months following the entry of an order of dependency and neglect. Tenn. Code Ann. § 36-1-113(g)(3); *see generally* ***In re Audrey S.***, 182 S.W.3d 838, 874–75 (Tenn. Ct. App. 2005) (discussing the requirements of this ground for termination). In the present case, the children were adjudicated dependent and neglected by order of March 2, 2017, and remained in DCS custody for eight months before the filing of the termination petition on November 9, 2017. As such, there is no dispute that this ground is applicable. We therefore proceed to consider the evidence presented in support of this ground.

Here, the trial court concluded that DCS presented clear and convincing evidence demonstrating persistence of conditions but made rather sparse findings:

> [Father] has rectified the problems related to drug use. [Father] is able to test negative for all testable substances on drug screens and did complete an alcohol and drug assessment and classes. However, this Court finds particularly troubling the fact that the child had teeth but [Father] believed that she could not have dental care. To date, [Father] has not shown an ability to act on the children's medical needs and the Court finds this likely to continue.

Here, we cannot agree with the trial court that DCS proved persistence of conditions by clear and convincing evidence. First, one of the primary reasons the children were removed from the Father's care was the fact that Father tested positive for marijuana. The trial court conceded that this condition has been rectified. DCS does not dispute that Father no longer has any issues with substance abuse, as there was no proof offered by DCS on this point at trial.

Second, it is not clear that Father continues to misunderstand the issues regarding Kiara's dental care. Although it is certainly troubling that the child's teeth were in such poor condition upon entering DCS custody, Father testified at trial that he was under the

impression that the child was too young to go to the dentist. DCS offered no proof, however, that Father is still under this impression. On the contrary, Father's testimony reflects that he now recognizes that failing to take Kiara to the dentist was obviously a mistake. As Father has not had custody of Kiara since her removal, and has therefore not been responsible for her medical or dental care, it is unclear what else Father could have done to demonstrate to DCS that he now understands his error. Accordingly, it appears that clear and convincing evidence does not support the trial court's finding that Father continues to be unable to act on the children's medical needs.

The basis for the finding of persistence of conditions as to Kyle is even more perplexing, as the order does not address Kyle or any of the conditions that necessitated Kyle's removal. In its petition for termination, DCS averred in part that the conditions at issue involved Father's unsafe and unclean home in light of Kyle's respiratory problems stemming from his NAS. However, in addressing DCS's allegation that Father abandoned the children by failing to provide a suitable home for the children, the trial court concluded that DCS failed to meet its burden to show that Father's home was unsuitable for the children. In reaching this decision, the trial court noted that DCS offered no photographs of the alleged conditions within the home, and noted the previous statements from the guardian ad litem that the home was acceptable for the children. Consequently, it is perplexing that the trial court would then find by clear and convincing evidence that Father's parental rights as to Kyle should be terminated based on persistence of conditions within his home.

It appears that the trial court's findings as to the conditions in Father's home are inconsistent. On one hand the trial court concluded that DCS failed to meet its burden in showing Father's failure to provide a suitable home, and simultaneously found that DCS did meet its burden in showing a persistence of the problematic conditions within the home. Even considering the totality of the evidence, we cannot affirm such a conflicting ruling. The trial court's finding that clear and convincing evidence supports termination of Father's parental rights based upon persistence of conditions is therefore reversed as to both children.

### Best Interests

Having determined that clear and convincing evidence supports two statutory grounds for termination of Father's parental rights, we now turn to whether termination is in the best interests of the children. "Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest." *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Even where a parent is unfit, termination may not necessarily be in the best interests of the child. *Id.*

Tennessee's termination statute lists the following factors to be used in the best interests analysis:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1)-(9).

The Tennessee Supreme Court has explained that:

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681–82 (Tenn. 2017) (internal citations omitted). Furthermore, "[a]scertaining a child's best interests does not call for a rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. The analysis requires "more than tallying the number of statutory factors weighing in favor of or against termination." *In re Gabriella D.*, 531 S.W.3d at 682 (citing *White v. Moody*, 171 S.W.3d 187, 193–94 (Tenn. Ct. App. 2004)). "The facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case," and the analysis "must remain a factually intensive undertaking." *In re Gabriella D.*, 531 S.W.3d at 682. Thus, "[d]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 878). In undertaking this analysis, the court must examine all of the statutory factors, as well as other relevant proof put forth by the parties. *Id.*

In the present case, the trial court determined that it was in both children's best interest that Father's parental rights be terminated. Father argues on appeal, however, that because the trial court "failed to mention any of the factors in the statute and did not indicate in anyway [sic] that it had considered them[,]" the trial court's ruling should be overturned. In support, Father appears to rely on our supreme court's ruling in *In re Gabriella D*. 531 S.W.3d 662, 682 (Tenn. 2017) (holding that the trial court must consider all of the statutory best interest factors, as well as any other relevant proof).

Respectfully, Father's argument is unavailing. Here, the trial court expressly noted that it "carefully considered the factors as enumerated in Tennessee Code Annotated § 36-1-113(i) in regards to the best interest" of the children, and discussed what it considered to be the most substantial and persuasive factors. While a detailed factor-by-factor analysis would constitute the best practice to avoid similar issues on appeal in the future, it appears that the trial did appropriately weigh the enumerated factors in section 36-1-113(i). Thus, despite Father's argument otherwise, the trial court's approach to the

best interest analysis does not constitute reversible error in the present case. *See generally* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Moreover, our own review of the record reflects that most, if not all, of the statutory factors weigh in favor of terminating Father's parental rights. Accordingly, we shift our attention to a review of the best interest factors.

As discussed previously, Father has failed both to maintain regular visitation with the children and to pay regular child support towards their care. Tenn. Code Ann. §§ 36-1-113(i)(3) & (9). DCS presented ample evidence regarding its interactions with Father throughout the time the children were in DCS custody, and that evidence reflects that Father only began consistent visitation after DCS filed its petition to terminate Father's parental rights. Likewise, Father made only one child support payment for the children in December of 2017, also after the filing of the petition. Accordingly, Father appears to take fundamental parenting responsibilities seriously only after being threatened with termination by DCS. This behavior inspires little confidence in Father's commitment to parenting the children.

The evidence presented at trial also reflects that Father does not have a meaningful relationship with either child. Tenn. Code Ann. § 36-1-113(i)(4). Kyle was placed in DCS custody when he was approximately two weeks old. Since then, Kyle's only interaction with Father has been Father's in-person visitation. Kyle is too young to speak on the phone with Father; thus, as mentioned previously, there have been long stretches of time in which Father and Kyle have had no interaction. Kiara, on the other hand, was in her Father's custody until approximately the age of three and appears to understand that Father is her biological parent. Kiara has, however, on multiple occasions expressed that she does not wish to live with Father and his family. Kiara's therapist testified at length about Kiara's relationship with her Father, explaining how Kiara has expressed to her that her Father often yells at the child and perhaps abused the child's mother in front of Kiara. The therapist also noted that Kiara has expressed that she does not want to live with her Father because "it is nasty. There is bugs. There is no food. . . . Bozzy is mean." Tenn. Code Ann. § 36-1-113(i)(7).

Further, the record shows that when Kiara and her Father do interact at visitation or on the phone, they often fight or Father aggressively chastises the child. For instance, Ms. Ferguson testified to several incidents in which Father yelled at Kiara over the phone because the child called her biological parents by their names, rather than calling them "mom" and "dad". Ms. Lyle-Joiner also testified that Kiara has told her that Father tells Kiara that Kiara's foster parents do not love her. Because of this and several other similar instances, the child frequently expresses to Ms. Ferguson that she does not like the phone calls. Ms. Ferguson also testified that when the child and the parents do engage in in-person visitation, Kiara makes sure to tell Ms. Ferguson that she wants to go home to her

foster parents' house afterwards. Based on the foregoing, neither child has a meaningful relationship with Father, and consequently this factor heavily favors termination of Father's parental rights. Tenn. Code Ann. § 36-1-113(i)(4). Moreover, it appears unlikely that a lasting adjustment in Kiara's relationship with her Father can occur at this point, as Father has demonstrated no ability or willingness to change how he communicates with the child. Tenn. Code Ann. § 36-1-113(i)(2).

In the same vein, a change in the children's current caretaker and physical environment would likely have a detrimental effect on their emotional, psychological, and medical conditions. Tenn. Code Ann. §36-1-113(i)(5). By all accounts, the children are bonded to and have a strong relationship with their foster parents. The foster parents wish to adopt the children, and the foster parents also currently care for, and are in the process of adopting, the children's two older half-siblings. Kiara and Kyle are close with their brother and sister, and the evidence reflects that they clearly benefit from having older siblings in the same home. Foster Mother testified that Kiara in particular is very close with her older sister and that all of the children play well together.

Moreover, the foster parents have demonstrated the ability and willingness to be responsible for Kyle and Kiara's extensive and ongoing medical needs. Tenn. Code Ann. § 36-1-113(i)(5). It is difficult to imagine that the children would not be profoundly affected if they were to be removed from their current placement. Indeed, the foster parents are the only parents Kyle has ever known. Clearly, the children have reached a level of security and stability in their current home that would be difficult to replicate should they be returned to Father. As such, this factor likewise significantly favors termination of Father's parental rights.

There is also evidence in the record that both children have been the victims of neglect, and that Kyle has been the victim of abuse. Tenn. Code Ann. § 36-1-113(i)(6). Indeed, Kyle was born with NAS and has had to undergo serious medical treatment, including surgery, because of that condition. It also is undisputed that Father neglected Kiara's dental health to the point that her teeth essentially decayed beyond repair. Tenn. Code Ann. § 36-1-113(i)(6).

Moreover, this Court is concerned about the possibility of the children's further exposure to illegal drugs should they be returned to Father's custody. Tenn. Code Ann. § 36-1-113(i)(7). Although we acknowledge that Father does not currently struggle with substance abuse, Father continues to allow Mother to reside in his home despite having been previously ordered by the court not to do so. Tenn. Code Ann. § 36-1-113(i)(7). There was evidence presented that the other adults who reside in Father's home, namely his parents, are also involved in substance abuse. *Id.* Consequently, Father does not appear to be appropriately concerned about further exposing Kyle and Kiara to substance abuse, and there is nothing in the record to reflect that these issues have been resolved. Tenn. Code Ann. §§ 36-1-113(i)(1) & (2).

The evidence also reflects that Kyle and Kiara would remain at risk of being exposed to domestic violence in Father's home. *See* Tenn. Code Ann. § 36-1-113(i)(6) & (7). While there have been no allegations that Father has ever abused the children, Kiara's therapist testified at length about her opinion that Kiara was exposed to domestic violence in Father's home. The trial court found this testimony to be significant and persuasive. Given that Mother and Father's parents continue to reside in Father's home, this Court is simply not confident that Father's home is free of domestic violence and substance abuse at this time. Tenn. Code Ann. § 36-1-113(i)(6) & (7). Nor are we convinced that a lasting adjustment of these conditions is likely to occur in the near future, as Father indicated at trial that he intends to keep living with his parents and the children's mother. Tenn. Code Ann. § 36-1-113(i)(1) & (2). Accordingly, these factors weigh in favor of termination of Father's parental rights.

The only factor remaining is section 36-1-113(i)(8), which asks whether the parent's mental or emotional status would be detrimental to the child or would prevent the parent from effectively providing safe and stable care for the child. While the trial court did not make any findings as to this factor in its final order, our review of the record has convinced us that this factor militates in favor of termination. We concede that Father appears to care for the children and demonstrates affection towards them at times. Father also, however, has demonstrated a troubling lack of self-control that would likely prevent him from effectively parenting the children going forward. Specifically, Father has on more than one occasion become enraged with Kiara for referring to Father and Mother by their first names rather than as mom and dad. During one visit with Kiara, a DCS caseworker documented Father raising his voice at Kiara after she indicated that she did not want to visit. The record shows that Father informed Kiara that

> You are coming home to us, no matter what anyone says to you, you are coming home with your Mommy and Daddy. They are not your parents, I don't care how many presents they buy you. Are you hearing me? You will be coming home to me. Parenting is a right, not a privilege and as your parent I have rights.

In another similar instance, a DCS caseworker documented the following exchange after Father heard the child refer to her mother as "Scarlett":

> [Father] said "She's your mother call her that!" He then continued on to say (in a raised voice) "Regardless of what anyone says, you are coming home to be with your father and mother. Irregardless of what you WANT! I don't care if they buy you gifts. Do you understand that? Do you understand me?" Kiara asked "Why can't I stay here?" [Father] responded more aggressively this time, "You are my kid you are coming home. Don't tell anyone you want to stay there because it will make it harder for Daddy."

This Court is extremely troubled by these exchanges; they demonstrate not only that Father easily loses his temper with the children, but also that his temper renders him unable to effectively communicate with and parent the children. Our concern is buttressed by testimony from Ms. Ferguson that Father has, on more than one occasion, lost his temper and become agitated with her to the point that Ms. Ferguson eventually requested that the court order Father to undergo a full psychological examination.

Accordingly, we conclude that Father's emotional status weighs in favor of termination of his parental rights. Tenn. Code Ann. § 36-1-113(i)(8). Father's interactions with the children suggest that Father cares more about preserving his legal rights than furthering the best interests of his children. Coupled with the allegations of domestic violence in Father's home, we have great concern that Father's current emotional state is not such that he is able to "effectively provide[] safe and stable care and supervision for the children." Tenn. Code Ann. § 36-1-113(i)(8). Although Father had the opportunity to attend anger management, he was discharged for noncompliance and has not returned. Tenn. Code Ann. §§ 36-1-113(i)(2). Father has also been counseled repeatedly by Ms. Ferguson about how to communicate appropriately with Kiara, and Father appears completely unwilling to recognize the problems with his conduct. Tenn. Code Ann. §§ 36-1-113(i)(1) & (2).

Considering the totality of the evidence both in favor and against termination of Father's parental rights, we conclude that termination is the children's best interest. Particularly significant in the present case is the fact that the children have no meaningful relationship with Father and that a change in environment would have a profoundly detrimental effect on the children's well-being. They are thriving in their current placement, and their foster parents wish to adopt the children along with their two older siblings. As such, we cannot find that removing the children from such a stable, harmonious home would be in the children's best interests at this juncture. Consequently, we conclude that clear and convincing evidence supports the finding that termination of Father's parental rights is in the children's best interest.

## Conclusion

The judgment of the Juvenile Court for Cocke County terminating Father's parental rights to Kyle S. and Kiara S. is affirmed in part, reversed in part, and remanded for proceedings consistent with this Opinion. Costs of this appeal are taxed to the Appellant Carmen S., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE